J-S06016-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1390 WDA 2025 |

Appeal from the Decree Entered September 26, 2025
In the Court of Common Pleas of Blair County Orphans' Court at No(s):
2025-00004

| | | |
|---|---|---|
| IN THE INTEREST OF: S.M-R.M, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1391 WDA 2025 |

Appeal from the Decree Entered September 26, 2025
In the Court of Common Pleas of Blair County Orphans' Court at No(s):
2025-00004A

BEFORE:   KUNSELMAN, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                **FILED:  April 10, 2026**

J.M. ("Father") appeals from the decrees involuntarily terminating his parental rights to B.M., a son, and S.M., a daughter (both born in April 2013) (collectively, "the Children").  Because the evidence established a proper basis for termination, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

Blair County Children, Youth and Family Services ("the Agency" or "CYS") has been involved with the family for more than one decade; both Father and A.M. ("Mother") (collectively, "Parents") have multiple convictions for endangering the welfare of children and driving under the influence. In 2022, Mother filed a protection from abuse act petition ("PFA")[1] against Father, which the court granted. The PFA, issued in March 2022, directed Father to stay away from Mother and the Children for three years. In February 2023, CYS learned Father and Mother were both in prison and filed a petition for emergency protective custody which the court granted. Mother was subsequently released from prison and reassumed custody of the Children, but in August 2023, the Children were placed in their current pre-adoptive foster home with R.H. and B.H. (the "foster parents), where they have continued to live ever since. Father was released from prison in July 2023.

In February 2025, the Agency filed a petition for the involuntary termination of the parental rights ("the petition") of Parents to the Children. The trial court conducted hearings on the petition in July and September 2025.[2] Mickayla Bennett ("Ms. Bennett"), testified she had been the Agency's caseworker for the family for approximately nine months. *See* N.T., 7/1/25,

---

[1] *See* 23 Pa.C.S.A. § 6101-6122.

[2] By order dated February 12, 2025, the court appointed Aimee Willett, Esquire, to serve as the Children's legal counsel and guardian *ad litem* ("GAL").

- 2 -

at 20. Ms. Bennett stated Father never gave her an updated address, inquired about the Children, provided any financial support for them, or sent any cards or letters to them through the Agency. *See id*. at 21-22. It was not until she contacted Father's probation officer that Ms. Bennett received Father's address and phone number. When she called Father and introduced herself, Father hung up the phone. *See id*. at 23-24. Father also refused to answer his door when Ms. Bennett visited and refused to meet with her with his probation officer; ultimately, Ms. Bennett obtained a court order to have Father appear in court to be served with the petition. *See id*. at 24-25, 32. When served with the petition, Father complained about the inconvenience to his schedule. *See id*. at 25-26. Father did not contact Ms. Bennett thereafter about the petition or about the Children. *See id*. Due to Father's non-cooperation, Ms. Bennett was never able to assess Father's housing situation. *See id*. at 26-27.

Ms. Bennett also testified she observed the Children with the foster parents in their pre-adoptive home and found them "doing well, very happy" and wanting to be adopted. *Id*. at 28. The Children did not talk to Ms. Bennett about Father at all. *See id*. at 28-29. Amy Morgan ("Ms. Morgan"), a foster care manager through Adelphi Village who visits with the Children twice per month, found them very happy, having their medical needs met, and enjoying a strong relationship with the foster family, with whom they had lived since August 2023. *See id*. at 35, 37-39. Ms. Morgan testified her work with the

Children spanned approximately two years, she attended previous hearings regarding the Children, and Father had never contacted her or sent anything for her to give the Children. *See id*. at 38-39. Additionally, the Children never mentioned Father to her. *See id*. at 41.

Father admitted he pled guilty to endangering welfare of children in 2019, but claimed he took the blame for what Mother had done. *See id*. at 103-06. He testified he gave CYS his change of address in February 2024. *See id*. at 46. Father asserted Mother filed for a PFA against him in March 2022, just before he filed a petition for custody; he claimed he did not receive immediate notice of the PFA. *See id*. at 55-57. Father testified he was incarcerated from December 2022, until July 2023, and will be on probation until 2032. *See id*. at 63-66, 77. He testified he completed in-patient treatment for substance abuse in May 2022, received a parenting certificate, and is a certified recovery specialist who works with addicts. *See id*. at 57-58, 63-66.

Father additionally testified he never told CYS about his attempts at rehabilitation or contacted them about any other matter. *See id*. at 61-62, 66-67. When asked what contact he had with CYS while he was taking classes and getting clean of drugs, Father stated:

> My efforts admittedly were minimal. I would make a phone call and ask if there were any hearings coming up or anything to that fact. . . . [I] wasn't even aware . . . who my children's case workers were, you know, and they would connect me to a voice mail and I would leave a message. Then I would call my lawyer,

most likely the same day, you know, I was a busy person, I was working on my recovery.

*See id*. at 67. He stated when the PFA expired in April 2025, he was "unaware of the situation. I unfortunately assumed that [Mother] would eventually be reunited with the children so my plan was to file for custody rights. . .." **Id**. Father claimed he spoke to lawyers who told him the PFA could not be amended without Mother's consent. *See id*. at 71-72.

Father admitted he never filed exceptions to the PFA or a request for modification, despite being in court for a dispositional review hearing in February 2024, when he, his counsel, the hearing master, and other parties discussed how he could seek to amend the PFA, including petitioning the court which issued the PFA for modification or amendment; and at the end of the discussion, J.M.'s counsel offered to discuss the options at length with him by phone later that day. *See id*. at 81-82, 87-90; N.T., 2/7/24, at 10-20.[3] Father testified he only attended two dependency hearings between March 2022 and the termination hearing date, even though those hearings were held every three months and gave updates about the Children. *See id*. at 85-90. Father also testified he never filed a motion to modify the PFA. *See id*. at 88-91. Father admitted that although he had been on probation for more than two years at the time of the hearing, and he had been to the courthouse on

---

[3] The trial court incorporated the records of the dependency proceedings into the termination case. **See** Trial Court Decree, 9/25/25, at ¶ 2.

more than one occasion, he never went to the Agency's office, which was in the same courthouse building. ***See id***. at 83, 94-98.

When the hearing resumed in September 2025, Joseph Walling, a certified recovery specialist, testified Father had developed a strategy for caring for the Children if he received custody, including receiving assistance from Father's unnamed friends whom Walling had not met. ***See*** N.T., 9/25/25, at 4-9, 15-17.

S.M. and B.M. testified *in camera* with all attorneys present. Twelve-year-old S.M. identified foster parents as "Mom and Dad" and knew precisely how long she had lived with them. ***See*** N.T., 9/25/25 (Children), at 4-6. She testified foster parents take care of her, and she feels safe with them; she also described her family chores, including caring for the family cat, rabbit, and chickens. ***See id***. at 6-8. S.M. testified she wants foster parents to adopt her, does not want to visit with Mother or Father, and was upset at the prospect of having to see them. ***See id***. at 9-14, 16-18.

At the outset of B.M.'s testimony, when asked to name his siblings, he listed S.M. and foster parents' other children. ***See id***. at 19. B.M. described his responsibilities of caring for the family dog and guinea pig, and testified he wanted to be adopted by foster parents, whom he regarded as his parents, did not want to visit with Father or Mother, and remembered Father unfavorably as someone who yelled frequently. ***See id***. at 22-28.

On September 25, 2025, the trial court granted CYS's petitions and terminated Father's and Mother's parental rights.[4]  Father timely filed a notice of appeal and contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  The trial court filed a Rule 1925(a) Opinion.

On appeal, Father raises one issue for our review:

> Did the trial court err and/or abuse its discretion by determining [F]ather had evidenced a settled purpose of relinquishing his parental claims and had not exercise reasonable firmness to fulfilling his parental duties despite his efforts to recover from drug addiction and position himself to become a positive influence to his children?

**See** Father's Brief at 6.

We review involuntary termination decrees for an abuse of discretion. **See Interest of M.E.**, 283 A.3d 820, 829 (Pa. Super. 2022).  This Court has further explained:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration

---

[4] Mother has not appealed from the trial court's determination.

of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.   Termination of parental rights has significant and permanent consequences for both the parent and child.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Id*. at 829-30 (internal citations, brackets, and quotation marks omitted).

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act,[5] which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination.  *Id*. at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the trial court determines the petitioner has established grounds for termination under one of these sections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare.  *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).  This Court need only agree with the trial court's determination as to any one subsection of section 2511(a), in addition to section 2511(b), in

---

[5] *See* 23 Pa.C.S.A. §§ 2101-2938.

order to affirm an involuntary termination decree. ***See M.E.***, 283 A.3d at 830

(citing ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Relevant here, section 2511(a)(1), (8) and (b) provides as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \* \* \*

(1) The parent by conduct continuing for at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

For reasons discussed further, *infra*, we focus on 23 Pa.C.S.A. § 2511(a)(1). To establish grounds for termination pursuant to section (a)(1), "[a] petitioner . . . must demonstrate by competent, clear and convincing evidence, the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." ***In re Adoption of C.M.***, 255 A.3d 343, 363-64 (Pa. 2021) (citation, internal quotation marks, brackets, and footnote omitted). Even where the failure to perform parental duties for six months is established, a court "must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." ***In re Adoption of L.A.K.***, 265 A.3d 580, 593 (Pa. 2021) (internal citation and brackets omitted). The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." ***Id***.

If the failure to perform parental duties is the result of obstructive tactics, that failure may be excused only if a parent demonstrates reasonable firmness in attempting to overcome the obstructive behavior or

- 10 -

barrier.  *See In re Adoption of C.M.*, 255 A.3d 343, 357 (Pa. 2021).  What constitutes a barrier is a fact-sensitive inquiry within the discretion of the trial court.  *See In re Adoption of L.A.K.*, 265 A.3d 580 (Pa. 2021).

Father asserts the trial court erred in finding CYS advanced clear and convincing evidence of grounds for termination, and that he had not manifested a settled purpose of relinquishing his parental claims.  He further argues the court erred when it stated the improvements he undertook occurred more than one year after the Children were placed in foster care, in part because the court incorrectly stated the Children had been out of his care for four years.  *See* Father's Brief at 17.

Although Father concedes he had no contact with Children and had not performed any parental duties, he asserts, citing a series of cases addressing section (a)(1), that the PFA "became an insurmountable obstruction" to him being involved in the Children's lives.  *See id*. at 19, and 17-23.  Father cites *In re Adoption of B.A.S.*, 345 A.3d 787 (Pa. Super. 2025), as a case affirming the decision not to terminate the rights of a father who endeavored to keep contact with his child, and *L.A.K.*, a case stating a father's filing of a motion to modify a PFA order and his attempts to maintain sobriety were enough to defeat termination.  *See* Father's Brief at 23-24.  Father further asserts *In re Adoption of D.N.L.H.*, 292 A.3d 1124 (Pa. Super. 2023)

(unpublished memorandum)[6] – in which this Court affirmed termination under section (a)(1) because the father there was found not to have preserved his connection to his children where, *inter alia*, he "did relatively little to overcome the barrier of a PFA" – is distinguishable because he asserts he disputed the PFA. **See** Father's Brief at 24-25. Finally, Father cites **In re S.S.W.**, 125 A.3d 413 (Pa. Super. 2015), a case which affirmed a decision not to terminate parental rights where a father's non-threatening PFA violations were insufficient to merit termination. **See** Father's Brief at 25-26.

The trial court found the Children had been out of parents' care for four years,[7] Father's improvements occurred more than one year after placement, and Father never attempted to modify the PFA. The trial court concluded the Children are bonded with foster parents and have no bond at all with Father. **See** Trial Court Opinion, 11/10/25, at 13-16.

At the outset, we acknowledge that both Father and the trial court do not rigorously distinguish sections (a)(1) and (a)(8) in their legal discussions as we require. **See In re Adoption of G.W.**, 342 A.3d 68, 85-86 (Pa. Super. 2025) (*en banc*) (citation omitted) (stating the grounds for involuntary termination "are not interchangeable"); **see also Interest of M.K.L.**, --- A.3d

---

[6] **See** Pa.R.A.P. 126(b).

[7] In fact, although the Children had not been in Father's custody for four years, we note they were not removed from his custody; rather, Mother lost custody of them in 2023.

---, ---, 2026 WL 508782 at *14 (Pa. Super., filed February 24, 2026). However, because Father's argument is essentially a challenge to the court's finding of grounds under (a)(1), and we discern from the record and the trial court's factual findings sufficient evidence supporting termination under (a)(1), we analyze the evidence under that section, which was one of the stated bases for termination in the Agency's petition.[8]

The record shows Father failed to perform parental duties for at least six months preceding the filing of the termination petition in February 2025. A caseworker from the Agency testified Father never inquired about the Children or provided any financial support for them during her tenure, which began shortly before the filing of the termination petition. Additionally, a foster care manager who had been working with the Children for approximately two years testified Father never contacted her or sent anything for her to give the Children.

Father's own testimony demonstrated his failure to perform parental duties. He admitted he stopped regularly attending status conferences concerning the Children in November 2023, and attended only two such hearings between March 2022 and September 2025. Further, Father actively avoided the Agency's representative when she attempted to serve him with

---

[8] *See Trust Under Deed of Walter R. Garrison*, 302 A.3d 129, 136 n.11 (Pa. Super. 2023) (stating this Court may affirm a lower court's decision if there is any proper basis for the result reached, even if it is different than the basis relied upon by the trial court).

notice of the termination petition, and thereafter never asked her any questions or attempted to contact her. Father himself described his efforts to contact the Agency as "minimal," despite the fact that on multiple occasions, he was in the same building where the Agency had its office. In fact, Father was so uninvolved with the Children and made so little effort to be informed of the circumstances of their lives, that although they had been in pre-adoption placement for more than two years, he assumed Mother would regain custody.

Father's argument depends largely on his asserted belief he was powerless to change the PFA barring him from any contact with the Children. However, he admitted he had been present in court in February 2024, when all parties present discussed how he could seek modification from the court who issued the PFA. Despite this discussion, Father did not file exceptions to the PFA or a motion for modification, had only "minimal" contact with the Agency by his own admission, and did not so much as visit the Agency's office, even though it was in the same building as the office where he went more than once on other court business. Additionally, the record evidence suggests Father provided no financial assistance for the Children's care. Father's behavior did not demonstrate reasonable firmness in attempting to overcome an obstruction to his contact with the Children. *See C.M.*, 255 A.3d at 357. Additionally, Father's explanation for his conduct – that he was busy and focused on his rehabilitation – is not satisfactory, given his failure to seek to

modify the PFA and attend status hearings at which he could have learned how the Children were faring or make any other inquiry; his lack of attempts to find out how the Children were during the time of the PFA or after, or to inform himself in whose custody the Children had lived for more than two years;[9] and his manifest lack of efforts to reestablish contact with the Children. Father's lack of reasonable firmness and the extensive evidence of the Children's strong connection with the foster family established termination would be in their best interests. *See L.A.K.*, 265 A.3d at 593.

The cases Father cites are readily distinguishable from his circumstances. In *B.A.S.*, this Court affirmed the denial of termination because the father who maintained contact with his child through letters and phone calls while incarcerated and made post-abandonment contact with the child. *See B.A.S.*, 345 A.3d at 796-97. Here, Father was not continually imprisoned, yet undertook no efforts to modify the PFA which kept him from contact with the Children, and made virtually no attempts to inform himself where the Children lived or the nature of their custody status.

In *L.A.K.*, the Supreme Court stated section (a)(1) was not proved where the father remained absent from his children as he struggled to overcome his alcoholism, but paid $600 per month in child support and filed

_____

[9] As noted, Father testified he assumed Mother would regain custody. Simple inquiry would have disavowed him of that asserted belief.

- 15 -

a custody action and attended court-ordered mediation and conciliation when Mother barred his contact with their children. *See L.A.K.*, 265 A.3d at 586, 594 (also quoting precedent stating "a parent's legal efforts to enforce custodial rights demonstrate affirmative performance of a positive parental duty"). Here, there is no evidence Father paid any child support and he did not undertake legal efforts to try to enforce custodial rights.

Finally, in *D.N.L.H.*, the father failed to carry out parental duties and made only minimal, indirect contact with the children, and "did relatively little" to overcome the PFA that was a barrier to his contact with the children. *D.N.L.H.*, 292 A.3d 1124 at *5. The same is plainly true here.

Accordingly, because the evidence established section (a)(1), we determine the trial court properly terminated Father's parental rights.

Having affirmed the trial court's finding of grounds for termination under section 2511(a)(1), we proceed to examine section 2511(b), the best interests of the Children. The record establishes the twelve-year-old Children felt integrated into the foster family with whom they lived, considered the foster parents' other children to be their siblings, felt cared for, and wanted to be adopted, leading the trial court to conclude the Children had a "genuine and deep" bond with foster parents. *See* Trial Court Opinion, 11/10/25, at 16. By contrast, the Children were upset by the idea of seeing Father in S.M.'s case, and in B.M.'s case had some level of antipathy toward Father. There was thus a clear basis for the trial court's finding the evidence established section (b).

Because we discern no legal error, we affirm the trial court's decrees terminating Father's parental rights.

Decrees affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 4/10/2026